(No. 11163.—Judgment affirmed.)

THE STATE PUBLIC UTILITIES COMMISSION *ex rel.* The American Sand and Gravel Company *et al.* Appellees, *vs.* THE CHICAGO AND NORTHWESTERN RAILWAY COMPANY *et al.* Appellants.

*Opinion filed June 21, 1917.*

1. PUBLIC UTILITIES—*the meaning of the words "between two points in this State," as used in section 42 of the Public Utilities act.* The words "between two points in this State," used in section 42 of the Public Utilities act, giving the Public Utilities Commission authority to establish joint rates to be charged by common carriers, refer to the territory over which the jurisdiction of the State and its agencies extends in regulating common carriers, as distinguished from the territory over which the jurisdiction of the Federal government extends in like matters.

2. SAME—*when Public Utilities Commission is not required to treat carriers as engaged in mere switching services.* The fact that the transportation services rendered by intermediate and delivering carriers in the Chicago switching district in delivering car-load shipments originating outside of the city of Chicago are carried on entirely within the city does not require the Public Utilities Commission to treat them as mere switching services, and the charge for such services may be required to be included in the joint rate.

3. SAME—*what order of Public Utilities Commission does not violate section 44 of Public Utilities act.* An order of the Public Utilities Commission requiring a joint rate to be established for the

transportation of sand and gravel to points in the Chicago switching district, which rate shall cover the services of all carriers engaged in the transportation, does not violate section 44 of the Public Utilities act, providing that nothing in the act shall be construed as requiring any common carrier to give the use of its terminal facilities to another carrier engaged in like business.

APPEAL from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

C. C. WRIGHT, and ROBERT H. WIDDICOMBE, for appellant the Chicago and Northwestern Railway Company.

O. W. DYNES, J. N. DAVIS, and S. D. SCHOLES, for appellant the Chicago, Milwaukee and St. Paul Railway Company.

EVERETT JENNINGS, T. F. MULLEN, and GEORGE M. MORGAN, for the State Public Utilities Commission.

WALTER E. McCORNACK, for appellees.

Mr. JUSTICE COOKE delivered the opinion of the court:

This is an appeal prosecuted by the Chicago and Northwestern Railway Company and the Chicago, Milwaukee and St. Paul Railway Company from a judgment of the circuit court of Sangamon county affirming an order of the State Public Utilities Commission requiring appellants and various other railway companies operating within the territory known as the Chicago switching district to establish joint rates on sand and gravel from Carpentersville, Elgin, Cary and Algonquin, on the line of the Chicago and Northwestern Railway Company, and from Libertyville and Spaulding, on the line of the Chicago, Milwaukee and St. Paul Railway Company, to points within the Chicago switching district, not to exceed four dollars per car of 60,000 pounds or less, plus ten cents per ton for excess over 60,000 pounds, over the Chicago rates, provided such joint

rates shall not exceed the sum of the delivering line's local switching charge added to the Chicago rates.

Prior to August 1, 1911, the rates on sand and gravel from the points of origin above named to points within the Chicago switching district were one and one-half cents per 100 pounds if delivery was made within the Chicago switching district at a point on the line of the originating carrier. If delivery was to be made at a point within the Chicago switching district on the line of some carrier other than the originating carrier an additional charge of four dollars per car, plus ten cents per ton for excess over 60,-000 pounds, was made. On August 1, 1911, as the result of an agreement made between the various railways entering the city of Chicago and operating within the Chicago switching district and a committee representing shippers, the joint rate on sand and gravel from the points of origin above named to any point within the Chicago switching district, where delivery was to be made by some railway other than the originating carrier, was increased to two and one-half cents per 100 pounds, of which the originating carrier received one and one-half cents for the line haul and the delivering carrier the remaining one cent per 100 pounds. In case it was necessary to use one of the belt lines in order to transfer a car from the originating carrier to the delivering carrier, the originating carrier paid the belt line for its services out of the one and one-half cents per 100 pounds received by it. The payment by the originating carrier for the service rendered by the belt line is termed "absorbing the switching charge." During the early part of the year 1914 the Chicago and Northwestern Railway Company filed a tariff with the State Public Utilities Commission by which it failed to provide for the absorption of the switching charge of the intermediate carrier, thereby, in effect, increasing the rate on sand and gravel from the points of origin above named to points within the Chicago switching district, where an intermediate carrier was used in trans-

ferring a car from the lines of the Chicago and Northwestern Railway Company to the line of the delivering carrier, to three cents per 100 pounds. Certain sand and gravel companies along the lines of the Chicago and Northwestern Railway Company filed a protest with the Public Utilities Commission against this increase in rates, and shortly afterwards the same companies, together with other sand and gravel companies along the lines of the Chicago, Milwaukee and St. Paul Railway Company, filed a complaint with the commission, attacking the former joint rate of two and one-half cents per 100 pounds, where delivery was to be made at a point within the Chicago switching district along the line of some railway other than the originating carrier, as unreasonable and discriminatory, and asking the commission to require appellants and the other railway companies operating within the Chicago switching district to establish through routes and joint rates from the points of origin named in the complaint located along the lines of appellants in this State to points located on the lines of the other railways within the Chicago switching district, in an amount not to exceed one and three-fourths cents per 100 pounds. The protest and complaint were consolidated for the purpose of a hearing, and after the hearing the commission entered the order, which was affirmed by the judgment of the circuit court, from which this appeal is prosecuted.

Section 42 of the Public Utilities act provides that "whenever the commission, after a hearing * * * shall find that the rates * * * between any two points in this State, are unjust, unreasonable or excessive, or that no satisfactory through route or joint rate or other charge * * * exists between such points, * * * the commission may order such common carriers to establish such through route and may establish and fix a joint rate or other charge * * *. which will be just and reasonable." Appellants contend that within the meaning of this statute

279 – 8

the city of Chicago, and not some particular point or points within the city, must be regarded as one of the "two points in this State" between which the commission is authorized to require carriers to establish through routes and to establish and fix joint rates, and as appellants have lines of railway extending from the points of origin of the sand and gravel shipments to the city of Chicago, the services rendered by the intermediate and delivering carriers within the Chicago switching district are mere switching movements and not a part of transportation between two points in this State, and the order of the commission is therefore *ultra vires.* The use of the words "between two points in this State" cannot be given the meaning or effect contended for by the appellants. Those words merely refer to the territory over which the jurisdiction of the State and its agencies extend in regulating common carriers, as distinguished from the territory over which the jurisdiction of the Federal government extends in like matters. The Chicago switching district is a territory about thirty miles long and twenty miles wide. The contention that the movement of a car by another railway from the tracks of one of the appellants in the city of Chicago to its destination within the Chicago switching district is but a switching movement, the charge for which cannot be included in a joint rate, is without merit. The sand and gravel pits which are the points of origin of the shipments in question are located from thirty-five to fifty miles from Chicago, and the distance covered by the so-called switching movement may in some instances be nearly as great as that covered by the line haul. The fact that the transportation services rendered by the intermediate and delivering carriers are wholly within the city of Chicago does not require the commission to treat them as mere switching services. *Grand Trunk Railway* v. *Michigan Railroad Com.* 231 U. S. 457.

Section 44 of the Public Utilities act provides that "nothing in this act shall be construed as requiring any common

carrier to give the use of its terminal facilities to another common carrier engaged in like business," and appellants contend that the order in question violates this section of the act. The same contention was made by appellant the Chicago, Milwaukee and St. Paul Railway Company in the case of *Chicago, Milwaukee and St. Paul Railway Co.* v. *Public Utilities Com.* 267 Ill. 544, with reference to shipments of coal entering the Chicago switching district. The same authorities were there cited and considered as are relied upon by appellants here in support of their contention, but we held that unless the order of the commission has the effect of permitting one railroad to operate its trains and cars over and upon the tracks and into the terminals of another railroad it does not contravene section 44 of the Public Utilities act. It requires no discussion to show that the order in question here has no such effect.

Appellants contend that the maximum joint rate which the order of the commission requires the railway companies to establish is confiscatory, and in support of this contention rely principally upon evidence offered by appellants tending to show that after paying the intermediate and delivering carriers the respective amounts heretofore paid for their services, appellants will, under the order, receive for the line haul a sum less than the cost of operation. The order does not require appellants to accept any specific sum or proportion of the joint rate for the line haul. It requires all carriers participating in the transportation of the sand and gravel from the points of origin to the points of destination to establish a joint rate not to exceed a certain charge per car, and if the carriers cannot agree upon a division of the joint rate among themselves, then, and then only, will the commission fix the proportion of the joint rate which each carrier will receive for the services performed by it. The only question concerning the reasonableness of the order involved in this case is whether the joint rate established by the commission is unreasonable and

confiscatory, and this question cannot be determined by assuming that the intermediate and delivering carriers will receive the same compensation for their services as they received under the former joint rate of two and one-half cents per 100 pounds and showing that the portion of the joint rate remaining will not pay the cost of operation for the line haul. The commission has not, by the order complained of, determined in what proportion the joint rate shall be divided between or among the participating carriers. Until it has determined this question we would not be justified in assuming that appellants will receive for the line haul only that proportion of the joint rate which they claim the evidence shows will be confiscatory.

The action of the commission in fixing the joint rate at one and one-half cents per 100 pounds, plus four dollars per car of 60,000 pounds or less and ten cents per ton for excess over 60,000 pounds, where delivery is to be made at a point not on the line of the originating carrier, is not against the manifest weight of the evidence on the question of the reasonableness of the joint rate. The evidence shows that sand and gravel belong to the lowest grade of commodities; that the average loading weight is 93,100 pounds per car; that the shipping season begins March 15 and ends November 15 of each year, and that the commodities are hauled principally in coal cars at a season when there is usually a surplus of coal cars; that an average of 180 cars of sand and gravel per day during the shipping season move from the points of origin named in the order to the city of Chicago; that these cars move in trains of 31 cars per train; that these cars are delivered in trains of 31 cars at the sand and gravel pits, where they are loaded and are then ready for transportation to Chicago without any assembling cost to appellants; that the average amount per car paid for the transportation under the rate of two and one-half cents per 100 pounds was $23.25, of which the originating carrier received $13.95 and the delivering car-

rier $9.30 where no intermediate carrier was used; that appellants' rate on slag, cinders, pig iron, ground iron ore and mill scale from Milwaukee to Chicago, a distance twice as great as that covered by the sand and gravel shipments, is $9.41 per car, and that the rate on sand and gravel from Joliet to Chicago, a distance of thirty-seven miles, is one cent per 100 pounds; that prior to August 11, 1911, the average charge of the delivering carriers for sand and gravel shipments destined to points within the Chicago switching district was $5.65 per car, which on that date was increased to $9.30 per car, and that the average charge of the delivering carriers for delivering coal, coke, grain, ice and crushed limestone within the Chicago switching district was, and still is, from three dollars to five dollars per car. It further appears from the evidence that while appellants have direct connections with most of the delivering carriers, they have recently adopted the practice of transferring the cars of sand and gravel to the delivering carriers through one of the belt lines owned by the originating and delivering carriers, thereby relieving appellants of the burden of transporting the cars through congested districts to the point of connection with the delivering carrier. It is apparent that this practice is wholly for the benefit of the originating carrier, and the charge made by the intermediate carrier under such circumstances should be paid by the originating carrier out of the rate established for the line haul.

Appellants have failed to establish that the joint rate fixed by the commission for the sand and gravel shipments in question is unreasonable or confiscatory. On the contrary, the evidence justified the order of the commission.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*